IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ANTHONY RICHARDS, SR.,           )
                                 )
        Plaintiff,               )
                                 )
    v.                           )        CIVIL ACTION NO. 2:07CV969-SRW
                                 )                    (WO)
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
        Defendant.               )

## MEMORANDUM OF OPINION

Plaintiff Anthony Richards brings this action pursuant to 42 U.S.C. § 405(g) and

§ 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for disability insurance benefits and supplemental

security income under the Social Security Act.  The parties have consented to entry of final

judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record

and briefs submitted by the parties, the court concludes that the decision of the Commissioner

is due to be affirmed.

## BACKGROUND

On November 9, 2002, plaintiff was working as a wash line operator at a plastics

recycling facility when he slipped  in water and fell, twisting his right knee and back.  At the

time of his injury, plaintiff was 39 years old. Plaintiff testified that he became unable to work

due to the injuries he suffered in the fall.  (R. 159, 216-19).

Plaintiff reported to the emergency room after his fall, complaining of back and left

lower leg pain. An x-ray of plaintiff's left leg was normal, and x-rays of his right knee revealed degenerative change in the knee joint. Plaintiff was discharged from the ER with prescriptions for Motrin and Lortab. (R. 123-29). Plaintiff returned to the ER the following night, complaining of right knee pain and swelling. He was placed in a right knee immobilizer and instructed to continue the Motrin and to follow up with his family physician. (R. 116-22).

Plaintiff sought treatment from Dr. Dexter Walcott of Alabama Orthopedic Specialists for his right knee pain. He told Dr. Walcott that he had been "on light duty," but that it was "difficult for him to do things like prolonged standing or climbing up on ladders," and that he had "a hard time walking on it or standing." (R. 134). Dr. Walcott ordered an MRI, which was performed on December 13, 2002 and which showed that plaintiff had a torn anterior cruciate ligament, medial and lateral miniscal tears, some arthritis and a "large 2-cm subchondral cyst" in the center of his tibial plateau. The radiologist recommended a bone scan. Dr. Walcott limited plaintiff to sedentary duty, noting that plaintiff can "do sit-down work." Dr. Walcott noted that plaintiff may need bone grafting of his subchondral cyst with arthroscopy, and a later ACL reconstruction. (R. 130, 133). The bone scan was conducted on December 19, 2002 and revealed a possible healing fracture of plaintiff's proximal tibia. Dr. Walcott noted that plaintiff would likely need surgical treatment. He continued plaintiff on "sit-down duty" and referred him to Dr. Herrick Siegel, an orthopedic surgeon. (R. 131-32).

The day before his bone scan, plaintiff was evaluated by Dr. Chandler, a chiropractor,

for complaints of back and neck pain.[1]  Dr. Chandler noted mild muscle spasm, and also noted that "X-rays of the Thoraco-lumbar spine reveals loss of I.V.D. spacing T12-L1 with mild anterior wedging T11-T12 and T12-L1."  (R. 179).  Dr. Chandler recommended and scheduled an MRI, but plaintiff did not return to Dr. Chandler for further treatment. (R. 178-82).

Plaintiff was evaluated by Dr. Siegel, the orthopedic surgeon, on January 14, 2003.  Dr. Siegel determined that plaintiff had an "[i]nterosseous ganglion cyst with extension interarticularly through the articular surface of the plateau."  He recommended open biopsy with bone grafting of the proximal tibia and "restricted weightbearing secondary to involvement of subchondral bone of the articular surface."  Dr. Siegel did not recommend ACL reconstruction, because plaintiff would "most likely require a total knee arthroplasty in years to come."  He recommended delaying the total knee arthroplasty "as long as possible given the patient's young age."  (R. 142).  Dr. Siegel admitted plaintiff for UAB medical center on January 30, 2003 and performed the curretage and bone grafting; plaintiff was discharged the following day.  (R. 135-140).  Dr. Siegel initially put plaintiff on a walker, then prescribed crutches on February 18, 2003.  Plaintiff was instructed not to put weight on his leg for at least ten weeks due to the bone graft.  Dr. Siegel prescribed physical therapy and instructed plaintiff to follow up with Dr. Walcott.  (R. 141).

Two months after he was released from Dr. Siegel's care, plaintiff visited Dr. John

---

[1]  A chiropractor is not an "acceptable medical source" and, thus, Dr. Chandler's diagnosis cannot be used to establish the existence of an impairment.  Evidence from a chiropractor may be used to show the severity of an impairment and how it affects a claimant's ability to work.  20 C.F.R. § 404.1513, § 416.913; Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1160 (11th Cir. 2004).

Haley of Southern Bone & Joint Specialists of Dothan. He complained of back pain radiating into his neck and also indicated that he wished to transfer his care for his knee from Dr. Siegel. Dr. Haley ordered an MRI of plaintiff's back, which was performed on April 30, 2003. The MRI showed "some Schmorl's nodes at several levels" and "some very minimal to mild facet hypertrophy," but no fractures, herniated discs, bulging or evidence of spinal stenosis. Dr. Haley noted, "With respect to his back injury, I don't see anything on the MRI, which would define the reason for that." (R. 158-160). Dr. Haley referred plaintiff to Daniel Peters, a physical therapist at Southern Bone & Joint Rehab, for work hardening, and also to a spine surgeon and to a knee specialist within his practice. Peters evaluated plaintiff on July 28, 2003 and developed a plan for work hardening, which Dr. Haley approved.[2]

Dr. Maddox evaluated plaintiff for his back pain on August 13, 2003. Dr. Maddox noted no objective spasm and a negative SLR. He observed that the plaintiff reported severe low back pain upon any rotation of the hips and knees and stated that there was "no specific musculoskeletal basis for this, as there was no rotation in the spine at all." He noted that plaintiff's "plain films show only mild degenerative changes at the thoracolumbar junction," and that his "MRI is similar in appearance with degenerative disc at that level but no evidence of any disc protrusion, spinal sac or root encroachment in evidence." (R. 156). Dr. Maddox ordered a bone scan to rule out a healing compression fracture, stating that "[i]f that's normal, I really don't see a basis for the severity of complaints. I do not believe that he is to be excused from work referable to his back based on this exam today." Dr. Maddox

---

[2] There are no notes regarding plaintiff's continued treatment in the work hardening program.

concluded, "I don't have any objective impairment for his back based on what I see at this time." (R. 155). In October 2003, after the bone scan, Dr. Maddox observed that plaintiff limped markedly favoring the right side and indicated that plaintiff's gait might produce some low back pain. However, he noted that the bone scan did not show increased activity in the spine, and that "[a]s far as the back is concerned, [he] would not consider this patient unemployable." He told plaintiff that he felt that plaintiff was capable of sedentary duty only, and that walking or standing was not realistic at that point. (R. 155).

Dr. Hall evaluated plaintiff for his knee complaints on October 28, 2003. Dr. Hall diagnosed plaintiff with "[s]evere tricompartmental osteoarthritis" in his right knee; a "[p]roximal tibial cyst, interosseous ganglion" which was "adequately treated at UAB," and a "[h]istory of back pain." Dr. Hall indicated that plaintiff would need a total knee arthroplasty for complete relief of pain. Dr. Hall released plaintiff to "sedentary work only." (R. 153-54). Dr. Hall referred plaintiff to physical therapist Peters for a functional capacity evaluation which was performed on November 11, 2003. Peters determined that the FCE was valid as to plaintiff's right knee, but that validity was questionable as to plaintiff's report of "back pain which was out of proportion to current M.D. findings, medical records, and clinical findings today." Peters indicated that plaintiff had demonstrated signs of symptom exaggeration with regard to his back pain. He determined that plaintiff was capable of work at the sedentary to light physical demand level. Dr. Hall agreed and certified Peters' work release guidelines as "medically correct." (R. 143-46). Plaintiff requested pain medications on several occasions in November and December 2003, but Dr. Hall and Dr. Maddox

declined to prescribe pain medication and recommended that plaintiff pursue pain management treatment.  (R. 151-52).

On March 23, 2004, plaintiff filed applications for disability insurance benefits and supplemental security income.  After a consultative examination performed on June 1, 2004, Dr. Willis Crawford determined that plaintiff "has the usual work-related activities such as sitting, standing, walking with difficulty but he is unable to lift and carry heavy loads."  (R. 161-65).  Plaintiff's claims for benefits were thereafter denied by the state agency.  (R. 24-37).

Two years later, on June 27, 2006, plaintiff visited Dr. Darrell Potter of Alabama Orthopedic Care with complaints of chronic low back pain, pain in his right wrist, and pain in his right knee.  Dr. Potter diagnosed "non-union fractured navicular with carpal joint arthritis," "severe osteoarthritis right knee," and "mild degenerative arthritis and disk disease lumbar spine."  Dr. Potter wrote:

> The patient was advised to have a total knee arthroplasty.  He needs no significant treatment for his lumbosacral spine other than conservative care; that is, non-steroidal anti-inflammatory medications, appropriate activities and exercise program.  As far as his wrist is concerned, it is not causing him all that much problem.  If he has significant symptoms in the future, he could have a partial wrist fusion.  The patient has been advised to go to a pain clinic if he wishes narcotic medications for his back.  This was done in 2003.  The patient is applying for disability and is not interested in having a knee arthroplasty at this time.

(R. 175-76).  The following day, plaintiff called Dr. Potter's office requesting pain medication; Dr. Potter denied his request.  (R. 176).

On July 18, 2006, an ALJ conducted an administrative hearing.  At the hearing,

plaintiff testified that he cannot work because he has severe pain in his back and needs a total knee replacement.  He used a walker for four months after his injury, while he was in therapy, and now uses a cane prescribed by his physician.  He lags behind others when walking, avoids stairs, and has difficulty walking on uneven surfaces.  He has back pain which radiates into his legs at a level of 8 on a scale of 10.  At the time of his testimony, his pain level was "[n]ine or 10."  He can sit about five minutes before he must shift or change positions, can stand for five or six minutes, and can walk for eight minutes.  Prolonged sitting increases his back pain, and standing or walking increases his knee pain.  He has to lie down during the day because of his pain.  He elevates his leg and uses ice packs.  He is not able to drive or to do household chores, yard work, or grocery shopping.  He has pain in his right wrist and numbness in his fingers.  He has been diagnosed with diabetes.  (R. 219-224).

The ALJ rendered a decision on August 5, 2006.  The ALJ concluded that plaintiff suffered from the severe impairments of "status post right knee arthritis and back and wrist problems."  (R. 22).  He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act.

On September 12, 2006 – several weeks after the ALJ issued his decision – Dr. Hassan Kesserwani, a neurologist, performed nerve conduction studies on plaintiff's arms. On September 21, 2006, Dr. Kesserwani examined the plaintiff.  He diagnosed bilateral

carpal tunnel syndrome (severe on the right) and lumbar radiculopathy in plaintiff's right leg. He prescribed wrist splints and scheduled plaintiff for a nerve conduction study/electromyogram of his right leg. Dr. Kesserwani performed the testing on plaintiff's right leg six days later, and diagnosed chronic right L5 and S1 radiculopathy. (R. 200-208). On September 28, 2006, Dr. Kesserwani completed a physical capacities evaluation form and a clinical assessment of pain form. He noted that plaintiff could lift five pounds occasionally and one pound frequently; sit for one hour and stand or walk for less than one hour in an eight hour work day; never climb, balance, stoop, bend or work around hazardous machinery; rarely engage in fine or gross manipulation or reaching overhead; occasionally perform pushing and pulling movements with his arms or legs, operate motor vehicles; and could occasionally be exposed to environmental problems. Dr. Kesserwani listed the bases for these restrictions as "[lower back pain] - radiculopathy," bilateral carpal tunnel syndrome, and osteoarthritis of the right knee. Dr. Kesserwani circled responses on the pain form indicating that "[p]ain is present to such an extent as to be distracting to adequate performance of daily activities or work," that physical activity would increase plaintiff's pain "to such an extent that bed rest and/or medication is necessary," and that side effects of prescribed medication "can be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc." (R. 200-10).

On August 31, 2007, the Appeals Council denied plaintiff's request for review. The Appeals Council stated that it considered the additional evidence submitted by plaintiff to the Appeals Council of plaintiff's September 2006 treatment by Dr. Kesserwani, but that the

additional information did not provide a basis for changing the ALJ's decision.  (R. 6-9).

Plaintiff contends that the Appeals Council erred by denying review and that the

Commissioner's decision is not supported by substantial evidence.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The

court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

Rather, the court examines the administrative decision and scrutinizes the record as a whole

to determine whether substantial evidence supports the ALJ's factual findings.  Davis v.

Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

(11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145.

Factual findings that are supported by substantial evidence must be upheld by the court.  The

ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity

attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985

F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails

to provide the court with sufficient reasoning for determining that the proper legal analysis

has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

Where, as here, the plaintiff has submitted additional evidence to the Appeals Council,

the court "must consider whether that new evidence renders the denial of benefits erroneous."

Ingram v. Commissioner of Social Security, 496 F.3d 1253, 1262 (11th Cir. 2007).

## DISCUSSION

9

The plaintiff challenges the Commissioner's decision, arguing that "the Appeals Council erroneously denied Mr. Richards' request for review in light of the material evidence submitted thereto that showed he lacked the ability to perform substantial gainful activity." (Plaintiff's brief, Doc. # 17, p. 13, Statement of the Issue).

Before proceeding to the specific issue raised by the plaintiff, the court addresses an error in the ALJ's decision regarding plaintiff's residual functional capacity. The ALJ stated:

> [I] find that the claimant retains the residual functional capacity to occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry up to 10 pounds; stand and/or walk for 6 hours out of 8 hours; sit for 6 hours out of 8 hours; pushing and/or pulling with right lower extremity to frequently, occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; never climb ladders, ropes or scaffolds; no manipulative limitations; no visual limitations; no communicative limitations; unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts and gases; avoid all exposure to hazardous machinery and dangerous heights.

(R. 20). This description of plaintiff's RFC is consistent with Exhibit 9F, the RFC form presumably completed by the state disability specialist. (R. 166-73). As plaintiff argues, this RFC finding is consistent with "light" work as defined in the Commissioner's regulations. See 20 C.F.R. § 404.1568(b). The Commissioner suggests that the ALJ found plaintiff to have the RFC to perform "sedentary" work. (Doc. # 25, p. 15)("Thus, the weight of the medical evidence supported the ALJ's finding that Plaintiff had the RFC to perform sedentary work.").

It is apparent from a comparison of the ALJ's decision with the transcript of the administrative hearing that the ALJ intended to find plaintiff capable of sedentary work, rather than light work. (See R. 225-28). The vocational expert testified that a hypothetical

candidate for employment with the capabilities and limitations expressed in Exhibit 9F – *i.e.*, the RFC stated in the ALJ's decision – *could* perform the "light jobs in [plaintiff's] past relevant work." (R. 226).[3] The ALJ did not find, however, that plaintiff could perform any of his past relevant work. Instead, the ALJ concluded that he could *not* perform past relevant work and proceeded to Step 5 of the sequential analysis. (R. 21). The vocational expert testified at the hearing as to jobs available in the regional and national economies for a claimant who is limited to sedentary work with a sit/stand option; it is this testimony upon which the ALJ relied in reaching his Step 5 decision that plaintiff has the residual functional capacity to perform jobs existing in significant numbers in the national economy. (Compare R. 21 with R. 227-28). All of the jobs listed by the ALJ as within plaintiff's RFC are sedentary. To the extent that the ALJ erred by indicating in his decision that plaintiff retained an RFC which is consistent with the definition of light work, the error did not affect the ALJ's ultimate conclusion and it is, therefore, harmless.[4] Cf. Dixon v. Astrue, 2009 WL 353300 (11th Cir. Feb. 13, 2009)(unpublished opinion)("'While we may not supply a reasoned basis for [an] agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'")(quoting Zahnd v. Secretary, Department of Agriculture, 479 F.3d 767, 773

---

[3] The vocational expert testified that the claimant could not perform his past relevant work if he were limited to sedentary work. (R. 226-27).

[4] "[W]hen an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand." Miller v. Barnhart, 2006 WL 1490162, *4 (11th Cir. 2006) (citing Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir.1983)); Wright v. Barnhart, 153 Fed. Appx. 678, 684 (11th Cir. 2005) (same).

(11th Cir. 2007)).  The court readily concludes, based on the medical evidence before the ALJ, that the ALJ's Step 5 decision was supported by substantial evidence.[5]

Plaintiff's allegation of error is that the Appeals Council wrongly denied review.  The Appeals Council "may deny review if, even in the light of the new evidence, it finds no error in the opinion of the ALJ."  Pritchett v. Commissioner, Social Security Administration, 2009 WL 449177 (11th Cir. Feb. 24, 2009)(unpublished opinion)(citing Ingram, 496 F.3d at 1262). The Appeals Council concluded that the new evidence submitted by plaintiff "did not provide a basis for changing the Administrative Law Judge's decision."  (R. 7).        Upon review of the record as a whole, the court concludes that the evidence of plaintiff's treatment by Dr. Kesserwani and the forms expressing Dr. Kesserwani's opinion regarding plaintiff's limitations do not render the Commissioner's decision denying benefits erroneous.  Dr. Kesserwani saw the plaintiff over a two-week period in September 2006.  He concluded, based on his evaluation of the plaintiff and nerve conduction studies, that plaintiff was then severely limited.  However, he prescribed only conservative treatment – wrist splints and Lyrica.  He expressed no opinion regarding how long plaintiff could be expected – with the prescribed treatment – to be as limited as described in the PCE and pain forms.  There is no evidence regarding plaintiff's response to the prescribed treatment, and no basis in the record for concluding that plaintiff's limitations, as expressed in the forms completed by Dr.

---

[5]  The court rejects plaintiff's argument that the professional opinions of plaintiff's treating orthopedic specialists – Drs. Walcott, Maddox and Hall – regarding plaintiff's capability to perform "sit-down" or sedentary duty must be discounted because plaintiff "saw these doctors at the [behest] of his Worker's Compensation Carrier," giving the physicians a financial incentive "to say that individuals can return to work."  (Plaintiff's reply brief, Doc. # 29, p. 5).

Kesserwani, either had rendered or could be expected to render plaintiff unable to engage in any substantial gainful activity for a period of twelve continuous months.  See Barnhart v. Walton, 535 U.S. 212, 218-19 (2002)(upholding Commissioner's interpretation of statute to require that the inability to engage in substantial gainful activity meet the duration requirement); Pritchett, 2009 WL 449177, 6 (affirming Appeals Council's decision to deny review despite new evidence, in part because the medical records did not demonstrate that the plaintiff's liver impairment would not resolve with treatment or would meet the 12-month duration requirement).[6]  Accordingly, the Appeals Council did not err in concluding that the new evidence did not provide a basis for changing the ALJ's decision.

## CONCLUSION

Upon review of the record as a whole – including the evidence first submitted to the Appeals Council – the court concludes that the decision of the Commissioner denying benefits is supported by substantial evidence and a proper application of the law and, therefore, that it is due to be affirmed.  A separate judgment will be entered.

Done, this 22nd day of May, 2009.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

_____

[6] In late June 2006, less than three months before Dr. Kesserwani evaluated plaintiff, Dr. Potter – an orthopedic physician – noted that plaintiff's right wrist was not "causing [plaintiff] all that much problem." (R. 176).  On examination of plaintiff's back, Dr. Potter noted decreased range of motion, but no paraspinal muscle spasm, no well localized areas of tenderness, no hamstring tightness and negative straight leg raising. (R. 175).  Before his June 2006 visit to Dr. Potter, plaintiff had not sought medical treatment for two and a half years.